Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
(520) 623-1922
*Attorney for Plaintiff*

**IN THE FEDERAL DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**
**TUCSON DIVISION**

| | |
|---|---|
| Lydia Aranda,<br><br>Plaintiff,<br><br>v.<br><br>Chicanos Por La Causa, Inc., an Arizona nonprofit corporation,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT FOR DAMAGES** |

**JURISDICTION, VENUE, AND TIMELINESS**

1. This court has subject-matter jurisdiction under 29 U.S.C. 216(b); 42 U.S.C. § 2000e, *et seq*.; and 28 U.S.C. §§ 1331.

2. Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over all state law claims because each state law claim arose out of the same set of facts and is so related to the federal law claims that it forms part of the same case or controversy.

3. As to Count II (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e), Plaintiff timely filed a charge of discrimination with the Arizona Office of the Attorney General pursuant to A.R.S. § 41-1481(A) and 42 U.S.C. § 2000e-5.

4. The above-described charge of discrimination was filed with the Arizona Attorney General on February 9, 2023. Pursuant to A.R.S. § 41-1481(D), this action is being filed within one year of February 9, 2023.

5. As to Count I (Equal Pay Act pursuant to 29 U.S.C. § 206(d)), this action is being filed within two years from the day that Plaintiff received the last discriminatory paycheck.

6. Venue is proper under 28 U.S.C. § 1391 in the District of Arizona because a substantial part of the events or omissions giving rise to the claim occurred in Pima County, as Plaintiff was engaged to work in Pima County and her principal place of work while employed by Defendant was in Pima County.

**PARTIES**

**Plaintiff**

7. Plaintiff Lydia Aranda (hereafter "Aranda") is a resident of Tucson, Arizona.

8. Aranda was employed full-time by Defendant from September 2019 to approximately July 2022.

9. Aranda is female and identifies as a woman.

2

**Defendant**

10. Defendant Chicanos Por La Causa, Inc. (hereafter "CPLC") is an Arizona nonprofit corporation organized under the laws of Arizona.

11. At all relevant times, CPLC employed more than 15 employees.

12. At all relevant times, CPLC was engaged in interstate commerce.

## FACTUAL ALLEGATIONS

13. CPLC was founded in 1969 in Phoenix, Arizona.

14. Today, CPLC is a nonprofit organization with an annual operating budget of more than $300 million and approximately 1,800 employees.

15. CPLC undertakes educational programming, housing services, economic development efforts, and other programs in five southwestern states.

16. CPLC is headed by a board of directors, which appoints an individual with the title of President & CEO to conduct day-to-day operations.

17. Approximately 4 to 6 executive vice presidents and the chief financial officer report directly to the President & CEO. Together, the President & CEO, the CFO, and the various executive vice presidents comprise what is commonly referred to within the organization as the "concilio." This small group of CPLC nonprofit executives is what would commonly be considered the C Suite in a similarly-sized for-profit company.

18. Within the organizational structure of CPLC, there is a group of presidents that report directly to the executive vice presidents. Despite the similar title, the presidents are distinct from the President & CEO (of which there is only one).

19. The various presidents are assigned to a geographic regions within the five states, or, in one instance, to Mexico (where CPLC began operations in 2019).

20. Each regional president is the representative of the President & CEO in his or her respective region. Additionally, each regional president is typically responsible for strategic planning, networking, attracting new opportunities and funds, and ensuring smooth operations within their regions.

21. At all relevant times, the regional presidents formed a body called the President's Circle – an elite advisory group to the President & CEO. The President's Circle met on a regular basis with the President & CEO to discuss strategic issues and priorities of the organization.

22. Prior to 2019, Arizona did not have a dedicated regional president. This was likely because CPLC is headquartered in Phoenix, and the leadership did not previously believe it necessary to have a regional president overseeing operations in the organization's backyard.

23. At all relevant times, the President & CEO was David Adame.

24. In 2019, Adame decided it was advantageous to designate Southern Arizona as its own region with its own regional president (sometimes referred to as the Southern Arizona "market" among CPLC personnel).

25. In September 2019, while Adame and other top executives were discussing the possibility of creating the position of regional president for Southern Arizona, Aranda

was hired by CPLC to be the new Director of Regional Business Development for Southern Arizona. Aranda's position was based in Tucson.

26. Less than two months after being hired as Director of Regional Business Development for Southern Arizona, Aranda was promoted to the position of President of Southern Arizona (sometimes also called President of Southern Arizona Market).

27. Aranda was promoted into the position that Adame had created.

28. Adame personally approached Aranda about the new role and asked that she step into that role.

29. Shortly after naming Aranda to the position of President of Southern Arizona, Adame made a social media post in which he referred to Aranda with the title of "president."

30. CPLC provided Aranda with business cards featuring the CPLC logo and identifying Aranda with the title of President of Southern Arizona.

31. CPLC management and IT staff authorized Aranda to create an email signature block using her company email account identifying Aranda as President of Southern Arizona.

32. Beginning in late 2019, Adame and other top management of CPLC regularly introduced Aranda as president, as being "in charge" of the Southern Arizona region, and as "managing" the Southern Arizona region during in-person meetings, teleconferences, and Zoom calls.

33. In the role of President of Southern Arizona, Aranda was paid a salary and was classified by CPLC as exempt for purposes of FLSA overtime eligibility.

34. Throughout 2020 and 2021, Aranda was CPLC's only female employee with the title of president. During this same time period, there were several male CPLC employees with the title of president.

35. Beginning in 2020, Executive Vice President Max Gonzales became Aranda's direct supervisor.

36. Gonzales regularly subjected Aranda to sex-based discrimination including, but not limited to, continually questioning Aranda's role and rank, paying Aranda significantly less than her similarly-situated male coworkers who held the title of president in other regions, refusing to give Aranda annual job performance reviews as was given to other male employees, and refusing to assign subordinates to Aranda, despite assigning subordinates to other male co-workers with the title of regional president.

37. Despite these handicaps imposed on Aranda by Mr. Gonzales, she was nevertheless held to expectations and metrics of success that were comparable to the other regional presidents. For example, both Aranda and the other regional presidents were evaluated, in part, based on their ability to attract and maintain funding sources for programming within their respective regions.

38. Despite these handicaps imposed on Aranda by Mr. Gonzales, she was nevertheless responsible to (and answerable to) an independent oversight and guidance body created by internal CPLC protocols and policies. Ms. Aranda was overseen, in part, by an advisory council, while Aranda's counterparts in other regions were overseen

by a board of directors. The two types of oversight bodies served the same functions in relation to their respective regional presidents.

39. In 2022, Aranda became increasingly aware that her compensation was far lower than that of male employees with similar titles, years of professional experience, educational attainment, and job responsibilities. Aranda raised these concerns, including with President & CEO Adame.

40. During this same time period, Mr. Gonzales suggested to Aranda that she be stripped of her regional president title and revert to the title of Director of Business Development for Southern Arizona (the role into which Aranda was originally hired in September 2019).

41. Aranda was told that the reason for this demotion in title was that the moniker 'president' was "creating confusion" among members of the public and among key stakeholders of CPLC. This was a patently pretextual reason for the adverse employment decision, as CPLC then employed several male 'presidents', and those individuals were not stripped of their titles on account of confusion.

42. Despite Gonzales' expressed desire to reduce Ms. Aranda's title, Gonzales did not intend to reduce or otherwise alter Ms. Aranda's day-to-day job responsibilities. Mr. Gonzales expected Ms. Aranda to perform the same tasks and achieve the same results for the organization with the title of Director of Business Development as she had previously with the title of president.

43. With Ms. Aranda's job title now in question, CPLC steadfastly resisted paying her in conformity with other regional presidents. Consequently, Aranda was performing substantially similar day-to-day tasks as her male co-workers with the regional president title, but now with a title in question and much lower compensation.

44. In June 2022, Adame and Gonzales notified Aranda that she was being terminated. CPLC attempted to justify her termination by explaining that an internal re-organization rendered her position superfluous. This explanation is pretextual: the only male counterpart to have lost his president role during this same time period was offered a new job with higher pay. By contrast, Ms. Aranda was fired and offered nothing.

## CLAIMS

### COUNT I
### 29 U.S.C. §§ 206(d) & 216(b) – Equal Pay Act

45. The allegations above are incorporated by reference in this Count.

46. Equal Pay Act claims have just two steps: (1) the plaintiff bears the burden to establish a prima facie showing of a sex-based wage differential; (2) if the plaintiff is successful, the burden shifts to the employer to show an affirmative defense.

47. Unlike in Title VII claims, no showing of pretext is required in Equal Pay Act Claims.

48. Plaintiff earned less than male co-workers with similar job positions, job responsibilities, professional experience, and day-to-day working conditions. There is no factor other than sex that can explain the pay differential.

49. The pay differential occurred between 2019 and 2022, and each discriminatory paycheck was a renewed violation.

50. Under this Count, Plaintiff is entitled to:

    a. compensatory damages;

    b. an equal amount as liquidated damages; and

    c. reasonable attorney's fees and costs.

## COUNT II
## 42 U.S.C. § 2000e – Title VII of the Civil Rights Act of 1964

51. The allegations above are incorporated by reference in this Count.

52. At all relevant times, CPLC was an "employer" as that term is used in 42 U.S.C. § 2000e.

53. Plaintiff was discriminated because of sex because she was denied the ability to hire subordinate employees while similarly-situated male co-workers were authorized to do so. In a circular argument, CPLC management argued that she was not equivalent to other regional presidents due to Plaintiff not having direct-reports.

54. Plaintiff was discriminated because of sex because she was terminated under a purported "restructuring" when similarly-situated male employees during the same time period were given promotions and raises.

55. Plaintiff was discriminated because of sex because she was attempted to be stripped of her job title when her job responsibilities and expectations remained the same as before, and the same as the job responsibilities of male counterparts in other regions.

56. Plaintiff was discriminated because of sex because she was paid less than male counterparts who had the same job titles and same job responsibilities.

57. Put differently, Plaintiff was subjected to different terms and conditions of employment on the basis of sex.

58. Under this Count, Plaintiff is entitled to:

    1. compensatory damages;

    2. punitive damages of up to $300,000; and

    3. reasonable attorney's fees and costs.

## COUNT III
## A.R.S. § 41-1463 – Arizona Civil Rights Act ("ACRA")

59. The allegations above are incorporated by reference in this Count.

60. For the same reasons as explained above, Defendant violated the employment provisions of the ACRA, located at A.R.S. § 41-1463.

61. Plaintiff is entitled to:

    a. Compensatory damages; and

    b. Reasonable attorney's fees and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that this Court grant her the following relief:

A. Compensatory damages, including consequential, general, and special damages, in an amount to be determined at trial;

B. Punitive damages pursuant to 42 U.S.C. § 1981a;

C. Compensatory and punitive damages as allowed in state law;

D. Reasonable attorney fees;

E. Costs of this action;

F. Any other relief that this Court deems appropriate.

Respectfully submitted this 9th day of February, 2024 by:

/s Paul Gattone
Paul Gattone
Arizona Bar # 012482
LAW OFFICE OF PAUL GATTONE
301 S. Convent
Tucson, AZ 85701
Email: GattoneCivilRightsLaw@gmail.com
(520) 623-1922
*Attorney for Plaintiff Lydia Aranda*